## LIABILITY FOR ASSAULT UPON A RAILWAY TRESPASSER.

Circuit Court of Huron County.

NEW YORK, CHICAGO & ST. LOUIS RAILWAY v. HENRY FIEBACH.

Decided, April 19, 1910.

*Assault—Liability for, Where the Assailant was Acting in a Dual Capacity—Railway Policeman May Also Act as Agent for the Company, and Company Become Liable for Assault Committed by Him While Acting as Agent—Driving People From Railway Yard Not the Duty of a Policeman—Evidence as to Intention—Witness Will Not be Permitted to Testify to the Purpose Which Controlled Him, When.*

1. A detective employed by a railway company, who has been duly commissioned as a policeman by the governor, may act as the agent of the company for some purposes and not within the scope of his authority as a policeman, and the company is liable for his acts as such agent, but is not liable for acts done within the scope of his authority as a policeman.

2. When an employe of a railway company, who is duly commissioned as a policeman by the governor, drives people from the company's yards who are not committing or threatening to commit crime, and has done so for a long period with the knowledge of the company, he does so as the agent of the company and not as a policeman, and the company is liable for his acts as such agent. *

3. It is not error for a court to exclude the testimony of an employe of a railroad company, who acted at times as a duly commissioned policeman and at other times as the agent of the company, as to whether in doing a certain act he intended to act as a policeman or as the agent of the railroad company.

*C. P. & R. D. Wickham,* for plaintiff in error.
*Jesse Vickery,* contra.

KINKADE, J.; PARKER, J., concurs; WILDMAN, J., dissents.

Error to Huron County Common Pleas Court.

This was an action in the court of common pleas to recover damages for an assault committed on Mr. Fiebach, as alleged, by the agent of the railway company in the yards at Bellevue, the jury returning a verdict of $1,000 for damages sustained by Mr. Fiebach, and judgment was entered accordingly.

* Judge Wildman dissents from the second paragraph of the syllabus,

A large number of errors are assigned setting forth the reasons why this judgment should be reversed. We find in the record one hundred and twenty-eight exceptions and twenty-eight requests to charge, and we are very clear that after a careful examination of this record no one will reach the conclusion that any of the rights of the defendant railway company have been overlooked by its counsel in this case; they have certainly been presented fully. .

From what I have said, it will be apparent that it is not practicable for the court to undertake to review in detail the exceptions that have been presented nor to review in detail the requests to charge. I think we have reached a conclusion that perhaps could not have been reached if the court had not been an odd number. We might have been as far apart as counsel were at the trial table, if the court had been an even number. It is perfectly apparent to anybody who will take the trouble to examine this record that it is full of very important questions, and as I have said, they are fully presented and all presented with great care, so that they may be passed upon and a correct result reached.

The case has caused us more concern than any other two cases that we have had, and in announcing the opinion of the majority of the court, I feel at liberty to say that even the majority of the court entertains some little doubt about the correctness of our conclusion in some respects.

Speaking of the requests to charge, while we hold that neither 5, 9, 12 nor 18 should have been given, it may be said that the majority of the court are somewhat in doubt about 5, 9 and 18. Twelve, we think might well have been given, because it is simply a charge that the commission from the governor was a commission that clothed a detective of the railroad company with police powers. We think the failure to give it can not be prejudical error in this case, because the commission is in evidence and, taking the case in its entirety, we can not see that the failure to give it could be prejudical to the defendant. We are very clear that none of the requests other than 5, 9 and 18 should have been given.

It is said that the court should have admitted evidence that was offered of the intention of Mr. Beatty, the railroad detec-

tive, to-wit, that he should have been permitted to state whether he intended to act as a policeman, or whether he intended to act as the agent of the company. Upon careful reflection, and an examination of this question in the record, we think that is not correct.

The record discloses that he was asked, not what he intended to do, but he was asked in what capacity he intended to act, and we think the capacity in which he acted can not be determined in that way.

It is said here that it is against public policy for the alleged agent of the railroad company to be at the same time the agent of the company and a commissioned officer of the state, and that consequently no duty that he performed, as long as he held his commission, can in any view of the case be properly outside his commission; that everything that he does must fall within his commission—within the terms and scope of his commission— whether it is a police duty or some other duty, and that consequently he falls within the rule that a municipality is not liable for the acts of its police officers and that the same rule applies to an individual who has secured an appointment of a policeman; that the payment of the salary under the statute does not make the railroad company responsible for the acts of the policeman.

It is true, unquestionably, that a municipality is not responsible or is not liable for the acts of its police officers, done in excess of their authority while acting as policemen. Nothing could be better established than that by the authorities and the authorities presented here by counsel for the railroad company are very strong indeed along the line that a policeman, working for a private individual under commission from the governor, is also acting in such capacity as that his employer is not responsible, or the man who pays him rather, is not responsible for any of his acts; and therefore, it is said that this assault, if an assault was committed, must be held to have been committed by the man in his police character, and if he exceeded his authority, nobody is responsible but himself, that certainly the railroad company is is not responsible. Many authorities are cited in support of that proposition.

We think the difficulty in this case lies in the fact that the proof in the record which is very long, tends to show that this man had duties outside of the duties as a police officer.

It is said here, that he had no specific instructions and that consequently his relation of agent to the company can not be shown by showing that he was held out as an agent of the company, as for instance, in a case where some man had contracted with him supposing him to be an agent because he had prior thereto contracted with him; that the rule does not apply here, because Mr. Fiebach never saw the man until a few moments before they were in this personal encounter; therefore, it is said that no holding out of the man would be of any avail as showing that he was an agent of the railroad company, and that inasmuch as the plaintiff has not been able to prove any specific instructions to the man, therefore he can not be held in this case to be an agent with any specific authority as is claimed here.

The man testified in two ways. He testifies in one instance that he got all of his instructions from the chief of police of the railroad company, Mr. Snyder, and that Mr. Snyder, whose office was in Cleveland, was charged with the general duty of instructing all subordinate officers in their duties and that he got his instructions from Snyder. Later he testified that when he began work, he reported to Mr. Blair, who was one of the division superintendents, and he states that he got his instructions from Blair; but perhaps his testimony later may indicate that he did not intend to say quite that much, because at a later point in the record he does state postively that he never had any instructions from any of the officers of the railroad company; he nowhere takes back the statement that he did get instructions from Snyder; but he says postively that he did not have any instructions from any of the other officers of the railroad company; however, in two places in the record, at least, he is inquired of what his duties were and he details what they were; and among other things he gives as his duties the driving of people out of the yard of the company; he says he was there to prevent people from riding trains in and riding them out, and to drive hoboes out of the yard, whatever that may mean; and that he had driven all classes of people from the yards, that he had been doing that from the time of his employment, some seven years before.

He does not say that he saw people who were violating the law, or who were about to violate the law to the extent, at least, that they had given evidence of such intention, but he simply says,

when saw people in the yard that to him seemed the proper people to have move along or to leave the yard that he should consider himself commissioned to perform that service and he proceeded to perform it and he did perform it for some seven years.

Without extending his statement further, I will say that the majority of the court are of the opinion that this record clearly discloses that this man had two lines of duty and that he performed them both—one as a policeman in which he performed purely police duties—and for this we think the authorities cited by counsel for the railroad company clearly established the proposition that the company would not be liable; but he also had another line of duty, and that was a line of work for the company that did not at all fall within his duty as a police officer; it might fall within the line of duty of any agent, whether he carried a police commission or not, and that in the discharge of those duties, he must be held, under this evidence, to be the the agent of the railroad company.

In this case, he encountered a man who was walking along by a train, toward a switch shanty, and he accosted the man and asked him what he was doing there, and some statements between them took place, each inquiring who the other was and both of them behaving about as unbecomingly as any two men could behave. Neither of them took the slightest pains, as appears, to avoid trouble; in fact, a reading of this record discloses that they were quite ready to get into difficulty, and like most any two men that meet in the dark in a railroad yard, with that disposition, that followed which naturally would follow and it followed with remarkable rapidity and with disastrous results to one of them.

The whole affair might have been avoided. We think it does not appear that this man was attempting to make an arrest at the time; we think it appears from the record that he found a man in the yard that he believed belonged to that class that he had customarily chased out of the yard and he proceeded in his own way to chase him out of the yard. Some objection was made by the other man, and his stopping at the shanty resulted in a free-for-all fight.

It is said that there was a cessation of hostilities, and that one of them politely asked the other one to pick up his cap for him,

and when the other offered to perform that service he attacked him again, and that renewed the fight and from that time on the most injury was done to the plaintiff below in this case and consequently he ought not to recover.

We have read the record in that regard and it presents to us rather a continous fight, and if there was any cessation of hostilities in which subsequent politeness played any particular part, we do not discover it in reading the record. It is not manifest to anybody; it is manifest that a row was on there, with all the incidents of a free-for-all fight; and it is also manifest, we think, that the aggressor was Mr. Beatty, who was the agent, in that transaction at the start, of the railroad company, and was not acting with view of making an arrest.

It is said that, after the assault was commmitted upon him, he then had authority to arrest the man, because the man had committed an assault upon him, and that he (Mr. Fiebach), being a violator of the law at that particular moment, it was of no moment that his energies were directed toward Mr. Beatty instead of somebody else.

We think that is true, if the facts were a little different, but we think it would require rather a fine sighting into this record to work out the situation and find that there had been a cessation of hostilities and a separation of the combatants and the dropping of the controversy, and then such a renewal as justified the man who first began it in making an arrest because he feared that the law was about to be violated. We think the first violation of the law was upon the part of Beatty, and it is. apparent that it was simply an excess of force used by Beatty in a representative capacity, as agent of the company in attempting to exclude the man from the property of the company, who had not violated any law so far as the record discloses, nor had he given any evidence of any intention to violate the law to such an extent as would have warranted either his arrest or his being excluded from the property of the company.

Beatty had a star on as a police officer, he says, and he says he had it buttoned under two coats; it was not disclosed at all; nothing was said by him about his being an officer until the fight had progressed to some considerable extent, and then the only thing that was said about it was the statement of another man

—perhaps a Mr. Tracy—who admonished Fiebach to go along with the man because he was an officer; but for some reason not apparent in the record, Beatty saw fit to conceal entirely the fact that he was an officer and refused to tell Fiebach his name, and in no wise, as we read it, acted as an officer, but acted as an agent of the company, and acted with excessive force, and acted with resulting injury to Fiebach.

A verdict of $1,000 has been returned and we think, upon reading the record, that the jury were justified in finding damage to that amount.

Without dwelling upon this case further—a case which we considered and examined very carefully for over a whole day in great detail—I will say that the judgment of the court of common pleas will be affirmed.

PARKER, J., concurring.

I desire on my own behalf to attempt to emphasize one or two points that seem to me to be very important in the case, and I do it because these are the points upon which the court has been divided in its opinions.

As indicated by my associate who has just spoken, there was an effort made to have Beatty testify as to his understanding of the capacity in which he acted on this occasion; that was denied by the court below, and we think correctly. But there was a series of requests to charged based apparently upon the same idea; that is to say, that the jury could, in some way, from the transactions, ascertain the opinion or idea of Beatty as to the capacity in which he acted, and that then they were to give that idea or opinion consideration, and that, under certain charges requested, if they had been given, it might have a controlling effect.

Now, we have concluded that although the evidence is not strong—is not entirely satisfactory—there is enough here to justify the jury in finding that Beatty was in fact acting at this time for the company (I do not mean in this particular transaction, but generally, at that period) in two capacities: first, as a policeman with all the authority of a policeman in a city of the first class, so long as he exercised that authority with

respect to the property of the railroad company, and in enforcing such rules as the railroad company may have laid down for the protection of itself, its property and the public, and that he was also acting as a sort of patrolman, perhaps a detective, in the preservation of order and in the protection of property for the railroad company, outside of and beyond, the scope of his duties and authority as a policeman.

It is with respect to his action in this last mentioned capacity that the plaintiff has undertaken to hold the railroad company liable. I say the evidence is not clear and satisfactory that he was employed by the railroad company to act and that he was acting in his private capacity, but we think there is enough to indicate that they recognized him as being in their service in the doing of those things; for instance, the driving of hoboes and undesirable and objectionable people away from the right-of-way, so that they might not commit trespasses or crimes on the company's property or grounds.

If he had been permitted to testify to what was in his mind, or what he may have supposed when a witness was in his mind, when he was acting on this occasion, as to the capacity in which he was acting, he certainly would have been in a position of great advantage to one party to the suit, and of great disadvantage to the other party, to say the least of it. In this particular instance it was intended by the testimony offered, to prove that he was attempting to act, and supposed he was acting, and intended to act in the capacity of a policeman. If he had been of a different mind, for instance, if he were a witness unfriendly to the railroad company, he might conclude, upon reflection, that he was not acting as a policeman, but that he was acting in the capacity of a private employe of the railroad company, and thereby put the railroad company at great disadvantage. Certainly he ought not, by his mere *ipse dixit*, or declaration of his supposition as to the capacity in which he was acting, either to fix the liability of the railroad company, or relieve or exonerate it. Yet what he might say as to the capacity in which he was acting, or supposed he was acting, would not be susceptible of denial, so there would be only one way of getting away from it, and that would be for the jury to disbelieve it. Unless they disbelieved his unsupported statement, which could not be contra-

dicted, his declaration upon the subject would be an absolute finality.

That may not always be a valid objection to evidence, but we think it should have a good deal of influence here, where, after the act, one undertakes to characterize his own act and fix the responsibility of himself or another by declaring what was in his mind as to the capacity in which he acted.

If the law were, as to such policeman, that the company should be responsible for his acts in excess of authority, or his wrongful acts as a policeman (as in the case of a railroad conductor) even if it were clear that his acts were entirely outside of the scope of the duties or authority of a policeman, if such evidence were competent, he might make the railroad company liable, or put it in great danger of being required to answer in damages by his simple declaration that, on the occasion, he understood that he was acting in the capacity of policeman.

We think that would be a very unsafe rule to adopt, and one that should not be adopted; and it follows that if he should not be allowed to testify as to his notion of the capacity in which he was acting, it would not be proper to direct the jury to try to divine from the circumstances and then to consider what he may have had in his mind upon the subject.

We think the capacity in which he was acting must be determined by the acts that he did. If they were within the scope of the duties of a policeman, then it should be said that he was acting as a policeman, and even if he exceeded his authority in the performance of a policeman's duty by the use of an excess of force or otherwise, under the law, the company would be exonerated from the consequences of his acts.

On the other hand, if his action was clearly outside of the scope of the duties or authority of a policeman, we think it should be found in that case, that he is not acting as a policeman, and it did not lie in his mouth to undertake to exonerate himself or the company by saying that the acts were acts that a policeman should do, or that he had it in his mind to act as a policeman on that occasion and therefore the company is not responsible.

On this occasion, as has been stated, he did not disclose that he was a policeman; he did not disclose it by the garb he wore—by any uniform; he did not disclose the badge of a policeman that

he had upon his person; and when the plaintiff below, who evidently did not known him and did not know that he was a policeman, but had been ordered by him to "move on," inquired of him who he was (not perhaps what his name was, for he was evidently seeking to ascertain by what authority Beatty undertook to interfere with him), Beatty refrained from telling him and did not disclose that he was a policeman, and then he proceeded to do acts which in our opinion were not within the scope of the duties of a policeman.

Beatty says that he went down there suspecting that this man was going to attempt to steal a ride on the train. The evidence in the case is pretty clear that when the altercation took place, and when, in the course of the altercation (according to the testimony of Fiebach), Beatty struck the first blow, the train had moved out, and there was no opportunity for anybody to steal a ride upon it; and therefore at the time of doing the acts complained of, whatever Beatty's suspicions may have been before—whatever his purpose may have been in moving down to that point—when he did the acts complained of, he could not have done them for the purpose of preventing Fiebach from stealing a ride upon the train. If he was there for that purpose, if that could be fairly said, still in the opinion of a majority of the court it was not within the authority of a policeman to arrest a man upon mere suspicion that he contemplates a crime. There must be some overt act amounting to an attempt or preparation to commit a crime to authorize an arrest on view without warrant.

I can not find from this record that there was ever any attempt to make an arrest. What Beatty did when he became provoked that indicated a purpose to arrest, according to his testimony, was to grab at Fiebach, and then they clinched and had a fight. What Fiebach says Beatty did was to strike him and knock him down. He made no declaration and gave no command; he did not say, "I arrest you, come along with me," or anything like that, at that time. Later on, and after the fight, there may have been something of that kind.

Now, I do not understand that, under the circumstances, he was authorized by law to arrest the man. He might have ordered him off the premises by virtue of his authority as a representative of the railroad company, but not, as I can see, as a police-

man; he might have ordered him off as a trespasser, and he should have disclosed why he did it, and his authority, especially after having thus been pressed for his authority. Then if the man persisted in remaining there, it is possible that in his other capacity as a policeman he might have arrested him for his refusal to obey the order, i. e., for continued trespass. Fiebach would not be subject to arrest because he was a trespasser, but because he refused to quit the premises when ordered to leave by one apparently authorized to give the order.

It seems to me, therefore, that Beatty, never having put himself in the position of a policeman where he had authority either to arrest this man for attempting to get upon the train or to arrest him because he persisted in trespassing, it does not lie in his mouth to say on his own behalf, or on behalf of the railroad company, that he was acting in the capacity of a policeman, and that it would not have been proper for the jury to find under the instructions that he was, or might have been acting in that capacity because he supposed he was so acting, and that the company should be exonerated because he supposed he was acting in that capacity.

Neither do I think that the testimony tends to support the idea advanced in argument that Beatty was not acting for the railroad company at all, but was acting on his own account, and was guilty of assault and battery for which he alone should answer.

It seems clear to me from the evidence that Beatty was undertaking to order and drive Fiebach from the premises in the exercise of his authority as private patrolman and that the assault and battery was committed in an effort to enforce the order to leave as a sort of "knock down and drag out."

WILDMAN, J., dissenting.

The case is by no means free from difficulty, and notwithstanding the very careful thought that has been given to it by both of my associates, as evidenced by their opinions just expressed, there still seems to be some lingering doubt about the propriety of an affirmance of this judgment. I have no doubt that the judgment should be reversed.

This man Beatty, at the time of the alleged assault for which judgment has been obtained in the court below, was acting in one

of three capacities:   He either, as substantially asserted in the
evidence of the plaintiff and as the latter describes the transaction,
committed an unprovoked assault, acting on his own volition, and
neither as policeman nor agent, upon an altercation arising
between Fiebach and Beatty and not in the performance of any
duty for the company and not in the performance of any duty to
the public; or else he acted as an agent of the company; or he
acted as a policeman in the discharge of his duties under the
commission given him by the governor and under the statute.

If he was acting, as the plaintiff describes, without in the first
instance directing him to go off the premises, without any effort
to prevent him from committing a trespass, if it be true that he
struck the plaintiff without provocation, after mere words between
them, then he was acting on his own volition and in his own be-
half; and surely, it can not be assumed that even if he was in
the employ of the company generally for the purpose of pro-
tecting its grounds and driving away trespassers the company had
ever authorized him to make unprovoked assaults upon persons
outside of any effort to carry out the work entrusted to him.

It is not a case where, as in the case of a passenger upon a
railway train, the person assaulted may be in a sense under the
protection of the company.   It is possible that if a railway con-
ductor, not in an effort to eject a passenger from a car, but
actuated by private and personal motives, should commit an as-
sault upon a passenger in a car, the company might be liable, al-
though our Supreme Court, so far as I am aware, has never so
held.

The company was not liable, if this man committed an assault
not within the scope of his employment as agent or servant (the
transaction that plaintiff describes), and the company was not
liable if he was acting as policeman under his commission as such.

It has been properly urged in argument in behalf of the plaint-
iff in error that Beatty could not act both as agent of the com-
pany and as a public officer at the same time.   I do not under-
stand that there is any discord among the members of this court
upon that proposition, but the question has been, in which one
of two capacities, that of policeman, or of agent of the company,
was he acting, in the transactions which are alleged as the grounds
of the plaintiff's recovery and which resulted in damage to the

plaintiff. I am inclined to agree with my associates that the court below was not in error in.refusing to permit the testimony of Beatty that he intended, in what he was doing, to act as policeman. If the question had been, whether at the time he took hold of Fiebach, he was intending to arrest him, I think the answer to the question should have been permitted; but there perhaps was involved in the inquiry what was the understanding of Beatty as to the nature of his duties, rather than an understanding or statement of just the kind of an act he was intending to do. His purpose is an important element in the case—whether he was at the time intending to make an arrest or whether he was at the time intending to eject the man from the company's grounds. If he was intending to make an arrest, he was surely doing something that the company could not authorize, or control or prevent. My own judgment is, that even if he was intending merely to eject the man from the grounds, he may have been acting also as a conservator of the peace, and consequently as an officer of the law.

It may be assumed that, although there is very little evidence in pany, still upon the very slight concession made along that line, the case that he was acting in any capacity for the company, or that he had ever received any instruction's whatever from the company he had some authority from the company to patrol its grounds and to drive away trespassers, or to direct them to go away from the grounds, acting as an agent of the company.

Assuming that he had such authority and that in directing any one to go off the grounds, he was acting as the agent of the company, it does not seem to me that it can be assumed that in the subsequent act, when he put his hands upon the man and attempted either to eject or to arrest him, he was so acting; that is, as an agent of the company.

General Code, 12522 (Revised Statutes, 6880e) provides a penalty for trespassing upon lands of another:

"Whoever, being about to enter unlawfully upon the inclosed or uninclosed lands or premises of another, and shall be forbidden so to do by the owner or occupant, or his agent or servant, or who, being unlawfully upon the inclosed or uninclosed lands or premises of another, shall be notified to depart therefrom by the owner or occupant, or his agent or servant, and shall thereafter enter upon such lands or premises, *or neglect or refuse to*

*depart therefrom,* except persons who are crossing said lands or premises for some lawful purpose, with the consent of the owner of such premises, *shall be guilty of a misdemeanor,* and upon conviction thereof, shall be fined,'' etc.

If Beatty, as agent of the company, notified Fiebach, to "get off the grounds or come along with me" and Fiebach "neglected or refused to depart," Beatty as agent might have ejected him, or as an officer might in my judgment have lawfully either ejected him to prevent further violation of the law or might have arrested him, or both.   He had all the powers under the statute by virtue of which he was commissioned, of any policeman of a city.

We have another statute, General Code, 12543 (Revised Statutes, 6982), which reads as follows:

"A person who climbs, jumps, steps or stands upon, or clings or in any way attaches himself to any locomotive, engine, or car, upon any part of the track of a railroad, unless in so doing he acts in compliance with law, or by permission under the lawful rules and regulations of the corporation then managing such railroad shall be fined not more than twenty-five dollars.''

Here we have another misdemeanor which may be the stealing of a ride, or it may be getting upon a car which is standing still, but in either event, it is trespassing upon some of the rolling stock of the company.   Beatty claims that was what this man was hanging about there for—to "steal a ride."

It is true, as suggested by Judge Parker, that when the final violence came, according to one witness, one train mentioned had moved on away from the station; but the controversy arose, as claimed by Beatty, upon the basis of his supposition that the man was there for the purpose of stealing a ride upon the cars.

Now, we have very clear authority by our Supreme Court that where evidence in a case is susceptible of a choice of interpretations and, especially in a case where the presumptions are more strongly against the plaintiff's theories than for them, it is the duty of the court to arrest the case from the jury and not permit the jury to speculate as to whether or not the plaintiff's theories may be well founded.   It is probable here, that Beatty was attempting to act as a police officer, although he grossly neglected some of his duties as such in not having a badge displayed and in not informing the man that he was an officer, so

as to remove any excuse for resistance. Although neglectful of his duties as an officer, if he was still attempting to act as an officer, then manifestly he was not acting as an agent of the company and the company would not be liable.

It seems to me the tendencies of the evidence are fortified by what seem to be the legal presumptions.

*Tolchester Beach Imp. Co.* v. *Steinmeier*, 72 Md., 318, is a case partly in point:

"A policeman appointed upon the application of a corporation which is required by law to pay his salary, is an officer of the state, and the corporation is not responsible for his acts as such officer in making an arrest, especially if it is not done on the premises of the corporation."

In *Jardine* v. *Cornell*, 50 N. J. L., 485, 486:

"The police officer was expressly directed by defendant's agent to make the arrest, and the court held that this made the officer the agent of the defendant, yet the court held that for the subsequent arrest the defendant would not be liable, saying that the act of the officer will be presumed to have been done by virtue of his official character, notwithstanding the fact that, prior to such disorderly conduct, the officer was in law the agent of the defendant."

In *Brill* v. *Eddy*, 115 Mo., 596, 605:

"The officer had been in the employ of the defendant as watchman and was, while so employed, appointed policeman by the mayor of the city. The court held it was a question of fact whether he was acting in his capacity of employe of the defendant, or as policeman. Yet the court said: 'It is no uncommon thing for corporations and individuals to employ duly appointed police officers to watch their property; and if such officer so employed make an arrest for disorderly conduct, the presumption is, that he acted in his official capacity as agent for the state, and not as agent of his employer. Being an officer whose duties are prescribed by law, it should be presumed, until the contrary is shown, that his employment contemplates only the exercise of such powers as the law confers upon him.'"

There are several other authorities that tend in the same direction in the brief before me from which I have read.

No authorities have been cited to us in conflict with the rule or the statement here made, that the presumption in the case of an arrest is that the man is acting under the authority of his com-

mission as a policeman, and that he is not acting as an agent. But, discarding all this, and considering only the rule that the burden of proof is upon the plaintiff to establish his claim that the man was acting as the agent of the company, it seems to me very clear that he has not, by the evidence in this case, substantiated his claim. His own evidence, as I have said, tends to show that the assault was an unprovoked one by Beatty, as an individual, acting neither as a policeman, nor within the scope of any authority as an agent of the defendant company. The defendant's testimony, through Beatty himself, is rather that he was acting as a policeman; it strongly tends to show that he was intending to arrest the man; that seems to have been the impression of the on-lookers and while he perhaps did not so conduct himself in doing it as to justify himself, in case he had been sued personally by Fiebach for assault and battery, still he did not so conduct himself as to make the company liable.

Without dwelling longer upon this phase of the case, and without attempting to read the special instructions asked by defendant and refused, I will content myself with saying that I think instructions 5, 9 and 12 should surely have been given and probably some others.

I do not agree with one of my associates that this was one continuous fracas from beginning to end. I think that according to all the testimony, not only that of Beatty, but that of Fiebach and the by-standers, there was a cessation of hostilities in which the parties separated and after which it was resumed in such manner that there can be no possible claim that as to subsequent transactions the witness Beatty was acting as the agent of the company. However, it is possible that the court sufficiently, in one of the instructions given, guarded the jury from blending all the elements of damage arising from the transaction before the renewal of the fracas with those which arose afterwards. The most serious injury was done to plaintiff after the fight was renewed by the plaintiff himself.

I am not prepared to say that the court erred in not sufficiently separateing the transactions in this regard, or that the damages, if permissible at all, were so excessive as to show passion or prejudice on the part of the jury.

The judgment, in my opinion, should be reversed for the reasons that I have stated.